## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

NORA J. PALMER,          )
                               )
       Plaintiff,        )
                               )
v.                           )     Case No. 6:16-cv-00223-NKL
                               )
CAROLYN W. COLVIN,     )
Acting Commissioner       )
of Social Security,         )
                               )
       Defendant.     )

## ORDER

Plaintiff Nora J. Palmer appeals the Commissioner of Social Security's final decision denying her application for disability and disability insurance benefits under Title II of the Social Security Act. The decision is affirmed.

## I.    Background

Palmer was born in 1951. She alleges she became disabled on 11/28/2008, after working for the U.S. Postal Service for many years. Her date last insured was 12/31/2014. The Administrative Law Judge held a hearing on 6/10/2015 and denied her application on 9/22/2015. The Appeals Council denied her request for review on 1/13/2016.

### A.    Medical history

In February 2008, Palmer complained to her primary care physician, Diane Voss, M.D., of sudden onset of back pain and said she had gone to urgent care and to the chiropractor. Palmer declined Dr. Voss' offer of a weight restriction for work. In April 2008, examination showed normal back and musculoskeletal findings. In May 2008, Palmer reported some back pain after walking in a 5K race, but said her back was better overall. Dr. Voss ordered an MRI

of Palmer's back in November 2008, which showed degenerative disc changes in the lumbar region and some annular tears, but no central spinal stenosis or disc protrusions. Palmer declined a pain clinic referral. An examination later that month showed her extremities were tender but her back was normal. In December 2008, Palmer was prescribed a TENS unit and physical therapy.

Palmer had 12 physical therapy sessions from December 2008 to January 2009. When the course of therapy ended, she reported having made good progress, had normal range of motion and strength, and rated her pain at 0 out of 10. She had another course of physical therapy consisting of ten visits that ended in March 2009. She reported steady improvement and at discharge, her range of motion and strength were normal.

In April 2009, Palmer reported back pain to Dr. Voss, but said exercises helped. Musculoskeletal findings were normal. Dr. Voss prescribed pain medication and a muscle relaxer. In July and October 2009, Palmer told Dr. Voss that she regularly did yoga and exercises and her back was better.

Palmer complained of back pain to Dr. Voss in April 2010. In August 2010, after two months of physical therapy, Palmer reported that she was doing really well and could manage her back pain with exercise. Her range of motion and strength were normal. In October 2010, Palmer told Dr. Voss she had numbness and decreased grip strength in the right hand and arm, and low back pain. She also said she could not sit or stand longer than 15 minutes. Dr. Voss increased Palmer's Vicodin. A cervical spine x-ray showed lower cervical degenerative changes with bilateral bony foraminal impingement greater on the right.

In January 2011, Palmer reported that she was taking zero to six doses of Vicodin per day, she was exercising regularly and doing yoga, and her right arm symptoms had resolved.

Hand and wrist x-rays taken in May 2011 were unremarkable.

Palmer went to Dr. Voss' office on May 18, 2011, but after noting Palmer could not walk, the doctor sent her to the emergency room to rule out a compression fracture. The emergency room physician noted "no acute distress" on physical exam. Tr. 391. Palmer had back tenderness and spasms, but a straight-leg raise test was negative, and she had full range of motion in the legs and normal sensation. She was administered pain medication and discharged with a diagnosis of back pain of questionable etiology and prescriptions for pain medication.

After her emergency room visit, Palmer followed up twice with an orthopedic surgeon, Jeffrey T. MacMillan, M.D. On May 9, 2011, she reported debilitating waistline pain that first began "10 years ago but [began] in earnest about 10 days ago" and said medication did not help. Tr. 608. She described the pain as sharp and stabbing, but without radiation to the legs. She denied numbness. She said she "typically treated her pain with PT modalities and yoga which managed it until recently." *Id.* Except for generalized lumbar paraspinal tenderness and guarded motion, her physical exam was normal. Dr. MacMillan ordered an MRI, which showed minimal lateral lumbar curvature, degenerative disc disease at L2-3 and L3-4, and small to moderate disc bulges at L4-5 and mild narrowing. At a follow up visit on May 23, 2011, Palmer told Dr. MacMillan that her pain medications helped but did not provide adequate relief. The doctor recommended a trial of facet blocks with radiofrequency ablation, which Palmer declined.

At a visit with Dr. Voss in August 2011, Palmer reported that she had not had a good experience with Dr. MacMillan. She complained of neck and arm pain. Dr. Voss assessed degenerative joint disease. At a November 2011 appointment, Palmer reported to Dr. Voss that she was doing her back and neck exercises, saw her grandchildren regularly, and visited a chiropractor for neck pain. Physical exam was normal. Dr. Voss assessed stable low back pain.

3

At a February 2012 visit, Dr. Voss noted mild back tightness and tenderness, but that Palmer's musculoskeletal findings were essentially normal and stable, and assessed lumbar spinal stenosis. In May 2012, Palmer complained of difficulty sleeping, and back spasm with radiation. Dr. Voss' findings on exam were similar to her February 2012 findings, and she recommended that Palmer continue her medications, and to stretch and stay active. At an August 2012 visit, Palmer reported that her back pain had flared up after being with her grandchildren and doing a lot of driving and sitting. She said she was taking six hydrocodone tablets a day without relief and asked to resume OxyContin, which Dr. Voss prescribed. In December 2012, Palmer saw a nurse practitioner, Tammy Osborn. Palmer reported that her radiating low back pain had improved since her last appointment, that she exercised regularly and was active, and that she took hydrocodone daily and OxyContin as needed. Osborn noted paraspinal back spasm on physical exam, but that Palmer's musculoskeletal findings were essentially normal or stable and compatible with known history. She also noted long-term use of high-risk pain medication. Osborn's assessment included stable spinal stenosis and she recommended stretching, yoga, and staying active.

Palmer next saw Dr. Voss in February 2013, with back spasm and antalgic gait. Dr. Voss noted normal or stable musculoskeletal findings and intact sensation, and prescribed physical therapy. From February through May 2013, Palmer made steady progress in physical therapy. She had decreased pain, which she could manage with pain medication, heat, and stretching. By the time of discharge from physical therapy, she no longer had muscle spasms and her range of motion had improved. At an April 2013 visit with Dr. Voss, Palmer said her pain level had improved and she tried to stay active. She described her pain as only moderately limiting but said she had to be careful with her grandchildren. Dr. Voss noted that Palmer's back pain was

4

stable and encouraged her to continue stretching and yoga as tolerated. At a July 2013 visit, Dr. Voss noted Palmer had had a flare up of back pain but was better, and renewed Palmer's pain medications. At an October 4, 2013 visit, Dr. Voss noted back spasm, but that Palmer's back was better and stable, and renewed Palmer's pain medications. Palmer also complained of bilateral hand pain, but declined referrals to a pain clinic or for a surgery consult. Palmer saw Dr. Pampolina on October 21, 2013, in follow-up for an epigastric issue, and on exam, the doctor noted normal musculoskeletal findings, i.e., full range of motion without tenderness or swelling. On October 24, 2013, Palmer saw the nurse practitioner, Osborn, about pain and a rash on her chest. Osborn diagnosed shingles. She noted Palmer had an antalgic gait and a left-side limp.

In December 2013, Palmer had a mental consultative examination with Jane W. Ruedi, Ph.D. Palmer told Dr. Ruedi that she retired from the postal service due to a back injury. She said physical therapy helped her control her symptoms and that she exercised and performed stretches. She also said she drove, managed her brother's Social Security Supplemental Security Income payments, did laundry, walked, went to the gym, attended weekly Bible study, had her grandchildren and friends over to visit, read, visited another woman once a week, took craft classes with a friend, and played cards once per month.

Palmer saw Dr. Voss for a physical in January 2014. She reported that chronic back pain was a factor "at times" and that she tried to remain active. Tr. 560. Her pain level had improved since her last appointment and was moderately limiting, but medications helped and she did not want to pursue pain clinic treatment or surgery. She said she had to be careful with her grandchildren, but had hobbies, engaged socially, went to the gym two to three times weekly, and performed her activities of daily living without difficulty. Examination revealed mild back tenderness and tightness and antalgic movement, and essentially normal and stable

musculoskeletal findings.  Dr. Voss assessed controlled lumbar spinal stenosis and recommended a book regarding back pain.

Palmer had physical therapy in March and April 2014 and was discharged with improved range of motion. The physical therapist noted deficits in all planes of motion.  She also noted that she had instructed Palmer about modifying activities at home to aid in decreasing her pain level, but did not believe Palmer had followed the instructions.

Lumbar images taken in April 2014 showed mild degenerative changes.  Palmer subsequently told Dr. Voss that she found it difficult to be comfortable in view of the back pain, and that it was painful to sit, stand, and lift.  She said physical therapy did not provide lasting benefit, and a TENS unit, which she used 30 minutes a day, did not help.  She had tried a Lidoderm patch with mild improvement.  Dr. Voss noted that Palmer's x-rays did not explain her pain.  An MRI of the lumbar spine taken April 30, 2014 showed mild degenerative disc bulges at different levels, with slight worsening at L3-L4; a small right L4-L5 disc protrusion that remained stable; no significant foraminal or central canal stenosis; and no definitive nerve root compression.

Palmer saw a pain specialist, Howard Aks, M.D., in June 2014 for low back pain that radiated to her legs.  She reported having had previous treatment including physical therapy, chiropractic, nonsteroidal anti-inflammatory drugs and other pain medications, and bedrest, but said that all treatment other than bedrest was ineffective.  Examination showed her spine was non-tender and stable.  She had normal range of motion except for pain with lumbar extension. She had positive bilateral straight-leg raises, but stable joints and normal muscle strength, tone, and leg range of motion.  Right leg strength had decreased dorsiflexion compared to the left, and ankle reflexes were 0+ on the right and 1+ on the left.  Her neck was normal and symmetrical;

6

posterior cervical muscles were nontender; and the cervical spine was stable with normal range of motion. Her arms were normal and she had stable joint stability and normal range of motion. Dr. Aks assessed lumbar radiculitis and recommended a lumbar epidural steroid injection, but Palmer wanted to think about it and later declined.

At a visit in August 2014, Dr. Voss noted that Palmer had declined the epidural steroid injection, and that Palmer said stretches helped. Dr. Voss prescribed pain medications, and recommended a back brace, Lidoderm patches, and a back pain book. In November 2014, the doctor noted Palmer had not followed up on the recommendations.

When Palmer saw Dr. Voss in February 2015, she reported that she had gotten the back brace and Lidoderm patch, and they were helpful. She also reported that she was able to cut down on her medications. Examination showed back spasm and tenderness, but Dr. Voss noted that Palmer's musculoskeletal findings were essentially normal or stable. At a March 2015 appointment with Dr. Pampolina for a rash, Palmer said she had gone on a cruise at the end of February. Examination showed she had full range of motion, no extremity clubbing or swelling, full motor strength in her arms and legs, and intact sensation.

Palmer saw the nurse practitioner, Osborn, in May 2015, reporting arm numbness, tingling, and weakness, and that she was unable to open and hold things well. Palmer reported partial relief with massage and past improvement with wrist braces. Examination showed back spasm and tenderness, but essentially normal and stable musculoskeletal findings, and normal deep tendon reflexes. Palmer had paresthesia in her arms when raised above her head for less than a minute, but sensation was otherwise intact. Osborn assessed carpal tunnel syndrome and recommended that Palmer restart her wrist braces. Osborn also ordered a cervical spine x-ray and an EMG. The test results showed mild bilateral carpal tunnel syndrome.

Palmer saw Dr. Voss in June 2015, reporting numbness and tingling in her hands. She said

she had been to pain management for her back, but she was not interested in pursuing it again. She denied neuro-muscular symptoms, but complained of life-limiting pain. She told Dr. Voss that her co-pay for OxyContin had increased, so she only took it half of the time. Examination showed mild back tenderness and tightness, and antalgic movement, and pain medications were prescribed.

### B. Expert opinions

Dr. Voss filled out a medical source statement in February 2009. Tr. 604-05. Palmer's diagnoses included degenerative joint disease, disc disease, and annular tear. Dr. Voss stated that Palmer's symptoms, "back pain with radiculopathy," resulted from a "sickness" that first appeared on November 7, 2008 and were not work related. Tr. 604. The doctor described Palmer's treatment plan as physical therapy, continued visits with her primary care physician, and medication. Where asked on the form to list medications that had been prescribed, the doctor listed only "ibuprofen…as needed for pain." Tr. 605. The doctor opined that Palmer could not lift more than 10 pounds or sit for more than one hour.

On January 25, 2014, Palmer had a physical consultative examination with Barry Palizzi, D.O. Tr. 403-414. She reported having had degenerative disc disease since 2003 or 2004, and spinal stenosis since 2008, and said physical therapy and medication had helped. She described occasional swelling and numbness in her hands. She reported daily activities of getting dressed, doing light housework with assistance, cooking, reading, doing crossword puzzles, going to church, driving, and grocery shopping. She stated she could sit and stand for 20 minutes at a time, walk two miles, and lift and carry up to 25 or 30 pounds occasionally. Examination showed that Palmer walked with a steady, symmetric gait. She did not limp or use an assistive device. She had some lumbar muscle spasms, but had full strength and range of motion, intact sensation, negative bilateral straight-leg raise, and equal and symmetric pulses and reflexes. Upper and lower extremity joints showed no swelling, tenderness, or deformity. Her hands and

fingers were grossly normal, and the doctor observed that Palmer could grasp a pen, write her name, and take her shoes on and off. She had full grip strength and wrist range of motion. She squatted and rose with ease, rose from a sitting position without assistance, and had no difficulty getting up and down from the examination table. She could walk on her heels and toes with ease, walk in tandem, and stand and balance on one foot at a time bilaterally. Dr. Palizzi opined that Palmer could sit, stand, or walk for eight hours continuously in a work day and did not need an assistive device. He assessed no lifting limitations and opined that Palmer could perform frequent postural and manipulative activities. The doctor noted that no radiological reports were available for his review. The ALJ gave Dr. Palizzi's opinion "partial" weight, noting Palmer had more limitations than the doctor had opined. Tr. 26.

State-agency medical consultants also reviewed Palmer's medical records. On February 6, 2014, Denise R. Trowbridge, M.D., opined that Palmer could perform light work with non-exertional limitations. Tr. 68-70. She further opined that Palmer could perform occasional postural activities and should avoid concentrated exposure to vibration and hazards. The ALJ gave Dr. Trowbridge's opinion "significant" weight. Tr. 16, 26. On February 26, 2014, Marcia Foster, M.D., reviewed Palmer's medical records and agreed with Dr. rowbridge's opinion. Tr. 65-66, 415-16. The ALJ also gave Dr. Foster's opinion "significant" weight. Tr. 16, 26.

On October 29, 2015, Palmer submitted additional evidence to the Appeals Council: a September 8, 2015 medical source statement from Dr. Voss. Tr. 2, 4-5; 638-643. Dr. Voss opined that Palmer could lift and carry less than 10 pounds frequently and 10 pounds at a time; could sit, stand, and walk for four of eight hours; and needed to lie down for one of eight hours. She could use her left hand repetitively for simple grasping, but not her right hand; could use

9

both hands repetitively for fine manipulation; could push and pull arm controls repeatedly with her left arm, but not with her right arm; and could not push and pull leg and foot controls repeatedly. Dr. Voss opined that Palmer was unable to perform jobs requiring bilateral manual dexterity. Dr. Voss further opined that Palmer could continuously reach and maintain balance, and occasionally bend and stoop, but could not perform the remaining procedural activities. The doctor opined that Palmer should have moderate limitation against unprotected heights, mild protection against driving automotive equipment, and no limitations against being around moving machinery or exposure to temperature and humidity extremes and dust. Dr. Voss pointed to Palmer's 2008 MRI showing degenerative disc disease in L3-4 and L4-5, facet degeneration, and right foraminal stenosis as objective findings supporting her opinion. She opined that Palmer's pain was debilitating, her fatigue was frequently debilitating, and she had poor coordination, numbness, and decreased sensation in her extremities. Dr. Voss also opined that Palmer's conditions or treatment would cause her to miss work more than three times per month. Finally, the doctor stated that Palmer had been functioning at the described level since August 2008 and her condition met Listing 1.04, disorders of the spine.

A vocational expert, Denise Waddell, testified at the hearing before the ALJ. Waddell classified Palmer's past relevant work as follows: postmaster—sedentary, specific vocational preparation (SVP) level 7, skilled[1]; mail clerk—light, SVP level 4, semi-skilled; and mail handler—heavy, SVP level 3, semi-skilled. The ALJ asked Waddell about a hypothetical claimant, of Palmer's age, education, training, and work experience, and who was limited to a reduced range of light work; limited to lifting 20 pounds occasionally and ten pounds frequently;

---

[1] A job's specific vocational preparation level denotes the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance[.]" *See* Dictionary of Occupational Titles, app. C, 1991 WL 688702.

could stand, sit, and walk for six of eight hours; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, stoop, kneel, and crouch, but never crawl; should never engage in hard, repetitive grasping such as would be required to use pliers or to open a sealed jar; and should never be exposed to vibration or hazards, including dangerous machinery and unprotected heights. Waddell testified that the individual could perform Palmer's past work as a postmaster and mail clerk. She further testified that her opinion was consistent with the Dictionary of Occupational Titles and was supplemented with her work experience in regard to hard repetitive grasping. In response to questioning by Palmer's attorney, Waddell testified that if the hypothetical individual needed to sit and stand at will, the mail clerk position could not be performed, and that one absence per month would be acceptable for the jobs she identified.

### C.     Palmer's function report and hearing testimony

In her October 22, 2013 function report, Palmer stated that she went to church once or twice a week, watered plants, visited with friends and family, attended Bible study, shopped twice weekly, walked, drove, went outside alone, read, did laundry, dusted, did light housework with her husband's help, cooked, and watched television. She and her husband watched their grandchildren, and cared for her brother by checking on him and taking him to appointments. She and her husband occasionally prepared large meals when they had company over. She attended plays, the ballet, and the symphony about once every three months. She stated that she could lift up to 25 pounds. She played video games and puzzles, and used a computer for 30 minutes at a time.

At the June 2015 hearing, Palmer testified that she stopped working for the Postal Service on November 28, 2008 due to degenerative disc disease and stenosis that rendered her unable to lift more than a light bag of groceries, walk more than 30 minutes, and sit and stand for more than 15 minutes. She testified that she had to lift up to 70 pounds as postmaster, but that she had

been told in 2008 to limit lifting to 20 pounds, and that she is currently under instructions to limit lifting to 25 pounds. She said she had weakness in her arms and trouble carrying and grasping due to carpal tunnel syndrome, and while her doctor had discussed surgery for carpal tunnel, she had opted not to do it. She also said she had an order for physical therapy, but had not followed up. She cooked, shopped, drove, spent time with family, worked in her yard on good days, and walked several times per week. The ALJ observed that Palmer was wearing a TENS unit at the hearing.

### D. The ALJ's decision

The ALJ found that during the relevant period, Palmer had severe impairments of degenerative disc disease and carpal tunnel syndrome. Palmer did not claim to meet any Listings, and the ALJ did not find that she met any.

The ALJ found Palmer has the residual functional capacity to perform:

> [A] range of light work as defined in 20 CFR 404.1567(b) except that she can lift, carry, push or pull 10 pounds frequently and up to 20 pounds occasionally. She can sit for 6 hours out of 8 hours; and claimant can stand and walk in combination for 6 hours out of 8 hours. She can never climb ladders, ropes or scaffolding. She can occasionally climb stairs and ramps, stoop, kneel and crouch. She can never crawl. She can never engage in hard, repetitive grasping, such as would be required to use pliers or open a sealed jar. She can never be exposed to vibration or hazards, including dangerous machinery and unprotected heights.

Tr. 19. The ALJ concluded Palmer was capable of performing past relevant work as a postmaster and mail clerk, and denied benefits.

## II. Discussion

Palmer argues that reversal and remand for award of benefits is necessary because the ALJ improperly assessed her credibility; the Appeals Council failed to explain how it weighed Dr. Voss' September 2015 opinion evidence; the RFC determination is unsupported by

substantial evidence on the whole record; and the ALJ failed to make specific factual findings with respect to her ability to perform past relevant work.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id.* The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

### A.     Credibility determination

Pointing to a new Social Security Ruling, Palmer argues reversal is necessary because the ALJ improperly assessed her credibility.

The ALJ issued the decision denying benefits on September 22, 2015, and concluded in part that Palmer's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible, for the reasons explained in [the] decision." Tr. 20. The ALJ then explained in detail how she had evaluated Palmer's statements. *See* Tr. 20-27. Palmer argues that the ALJ engaged in a "character attack and/or assessment of 'truthfulness' based on scouring the record for any purported inconsistency." Doc. 19, p. 5. She points to Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, which

became effective March 16, 2016, after the date of the ALJ's decision, and superseded the ruling in effect at the time of the decision, Social Security Ruling 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements. 81 F.R. 14166-01, 2016 WL 1020935; 1996 WL 374186. Unlike SSR 96-7p, SSR 16-3p does not use the term "credibility." Palmer argues that under SSR 16-3p, "credibility is no longer an assessment to be made." Doc. 19, p. 5.

Enactment of the new Ruling does not require reversal. As discussed below, the ALJ's evaluation of Palmer's subjective complaints under SSR 96-7p, the then-existing ruling, rather than SSR 16-3p did not have a practical effect on the outcome. *Compare Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (reversal requires a prejudicial error), and *Welsh v. Colvin,* 765 F.3d 926, 929 (8th Cir. 2014) (where ALJ performed the evaluation required by the applicable SSR, but failed to explicitly cite the SSR, the arguable deficiency in opinion-writing technique "had no practical effect on the decision and therefore [was] not a sufficient reason to set aside the ALJ's decision") (citation omitted).

Both SSR 96-7p and SSR 16-13p direct that evaluation of a claimant's subjective symptoms shall consider all evidence in the record. Both Rulings also incorporate the regulations, 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), that identify factors to be considered in evaluating the intensity, persistence and functionally-limiting effects of the symptoms, including a claimant's daily activities; the nature, duration, frequency and intensity of her symptoms; precipitating and aggravating factors; and the type of medication and other treatment or measures used for the relief of pain and other symptoms, *i.e.*, the familiar factors identified in *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984). But while SSR 96-7p expressly provided that a credibility finding was required to be made under those regulations, SSR 16-3p expressly

provides that use of the term "credibility" was being eliminated because the SSA regulations did not use it. 81 F.R. at 14167. SSR 16-3p further provides:

> In [eliminating reference to "credibility"], we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation.

*Id.* SSR 16-3p also expressly provides that the ALJ may not make conclusory statements about having considered the symptoms, or merely recite the factors described in the regulations. Rather,

> The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent, and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

*Id.* at 14171.

Here, the ALJ articulated the regulatory factors for evaluating Palmer's claims about the intensity, persistence and limiting effects of her symptoms, and gave specific reasons for concluding they were not supported. The ALJ found that the clinical and objective findings in the record were inconsistent with Palmer's allegation of total debilitation. The record shows her back pain comes and goes. Her primary care providers frequently documented normal and stable musculoskeletal findings, as well as range of motion, strength, and sensation. At a January 2014 consultative examination, Dr. Palizzi similarly noted normal findings: Palmer walked normally; had full strength and range of motion, intact sensation, and a negative straight-leg raise; squatted and rose with ease; could walk on her heels and toes, and in tandem; and could balance on one foot at a time bilaterally. With respect to her carpal tunnel syndrome, Palmer complained of symptoms to Dr. Voss in October 2010 but reported that they had resolved by January 2011. She later saw a chiropractor about her symptoms. But during the evaluation by Dr. Palizzi in January

2014, the neck, arm and hand exam was normal, and he observed that Palmer could grasp a pen, write her name, and take her shoes on and off.  Palmer did not report arm or hand pain to the pain specialist, Dr. Aks, who also noted a normal neck and arm exam.  In May 2015, she complained to the nurse practitioner of numbness and tingling, and inability to open things, but her sensation was intact.

The ALJ noted that Palmer's imaging results also failed to support her claim of total disability.  A 2008 MRI of her back showed degenerative changes, annular tears, small to moderate disc bulging, and mild narrowing, but no significant spinal stenosis or cord impingement.  An April 2014 MRI showed mild foraminal and central stenosis in L3-L4, but the report concluded there was "[n]o significant foraminal or central canal stenosis present" and no nerve root compression.  Tr. 530-31.  Palmer's generally mild imaging results were inconsistent with her allegations that her back impairment was disabling.

The ALJ also found that Palmer's conservative treatment history was inconsistent with her allegations of total disability.  Dr. Voss, her primary care provider provided most of her back treatment.   In the February 2009 medical source statement, the only current pain medication Dr. Voss noted prescribing was an over-the-counter pain medication, ibuprofen.   Dr. Voss at other times prescribed narcotic pain medications, as well as a TENS unit which the ALJ observed Palmer to be wearing during the hearing.   Palmer was prescribed physical therapy from 2008 through 2014 for back pain and those treatment records showed the treatment helped.   She also reported to providers that she could usually control her back pain on her own with physical therapy, exercise, stretches, and medication. Dr. Voss noted in January 2014 that Palmer's back pain was controlled, and that in February 2015, Palmer experienced improvement with a back brace and Lidoderm patches and was able to cut down on her pain medications.   She was prescribed physical therapy for her carpal tunnel syndrome and wrist braces.   Such conservative treatment recommendations are

inconsistent with a claim of disabling pain. *See Lawson v. Colvin*, 807 F.3d 962, 965 (8th Cir. 2015) (holding that if a claimant's pain is controlled by treatment or medication, it is not considered disabling); *see also Milam v. Colvin,* 794 F.3d 978, 985 (8th Cir. 2015) (finding that the ALJ properly considered the claimant's treatment history of exercises and treatment as relatively conservative).

The ALJ also found that Palmer's activities were inconsistent with her allegations of disabling back pain and carpal tunnel syndrome. In 2008, when Palmer was still working, she complained of back pain to Dr. Voss, who offered to write a lifting restriction, but Palmer declined it. Later the same year, Palmer walked in a 5K race. In her 2013 adult function report, Palmer admitted she could lift 25 pounds. After reporting improvement with the back brace and Lidoderm patch in February 2015, she went on a cruise later that month. She exercised; did yoga; went to the gym three times per week; attended plays, the ballet, and the symphony; watched her grandchildren; looked after her brother; took craft classes; worked in her yard; visited with family and friends; participated in a weekly Bible study and attended church; cooked large meals with her husband when company came over; shopped; drove; and performed light housework. She reported that she stayed active and admitted in January 2014 that she performed her daily activities without difficulty. Such inconsistencies between a claimant's subjective complaints and daily activities detract from a claim of disabling pain and support denial of benefits. *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).

The ALJ also found that Palmer's noncompliance with treatment recommendations weighed against her claims. Palmer declined Dr. Voss' referral to a pain clinic in November 2008. Palmer declined a trial of nerve blocks with radiofrequency ablation recommended by an orthopedic surgeon. She told a pain specialist that the only treatment that helped her back pain was bedrest, but declined his recommendation of an epidural steroid injection. She delayed a few months in following up on Dr. Voss' recommendations to obtain a back brace, Lidoderm patches, and a book

17

about back pain management. She failed to follow a physical therapist's recommendation for activity modification at home. Dr. Voss recommended surgery for Palmer's carpal tunnel syndrome, but she opted not to have it. Failure to follow treatment recommendations weighs against a claimant's subjective complaints and supports denial of benefits. *See Guilliams v. Barnhart,* 393 F.3d 798, 802 (8th Cir. 2005); *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); and 20 C.F.R. § 404.1530(a).

Pointing to 20 C.F.R. § 404.1530, Palmer argues that the ALJ should have identified the reasons why she failed to follow treatment recommendations. The regulation provides that in order to receive benefits, a claimant must follow prescribed treatment recommendations if the treatment can restore the claimant's ability to work, or else benefits will be denied or rescinded. The regulation gives examples of "good reason[s] for not following [prescribed] treatment," such as a religious objection; a recommendation for surgery where the same surgery has been previously performed without success; a recommendation for treatment that, due to its magnitude or unusual nature or some other reason, is very risky for the claimant; or treatment that involves amputation of an extremity or major part of an extremity. *Id.* at § 404.1530(c)(1)-(5). Nothing in the years of medical records in evidence suggests that anything like the "good reasons" identified in the regulation exist with respect to Palmer. Any failure of the ALJ to identify the reasons why Palmer did not follow treatment recommendations is at most a non-prejudicial defect in opinion writing that does not merit reversal. *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992) (an arguable deficiency in opinion writing technique is not grounds for reversal when that deficiency had no bearing on the outcome).

The ALJ's evaluation of Palmer's subjective complaints was based on the entire record, reflects consideration of the appropriate factors, and is supported by substantial evidence.

### B. Weight given Dr. Voss' opinions

Palmer argues that the ALJ did not properly weigh Dr. Voss' opinion of February 2009

and should have given it more than "little" weight. Palmer also points to Dr. Voss'
September 2015 opinion, which Palmer submitted after the ALJ issued her decision, arguing that
the Appeals Council failed to properly consider it.

### 1. The February 2009 opinion

The amount of weight given a treating medical source opinion depends upon support for
the opinion found in the record; its consistency with the record; and whether it rests upon
conclusory statements. An ALJ must give controlling weight to a treating medical source
opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic
techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 786
F.3d 1126, 1132 (8th Cir. 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir.
2007)). But the opinion may be given "limited weight if it provides conclusory statements only,
or is inconsistent with the record." *Id*. (citations omitted). The ALJ "may discount or even
disregard the opinion … where other medical assessments are supported by better or more
thorough medical evidence, or where a treating physician renders inconsistent opinions that
undermine the credibility of such opinions." *Id.* (*citing Miller v. Colvin*, 784 F. 3d 472, 477 (8th
Cir. 2015)). *See also Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (treating physician's
opinion appropriately afforded less weight when inconsistent with clinical treatment notes).

Here, in deciding to give Dr. Voss' February 2009 opinion little weight, the ALJ
correctly noted it was inconsistent with the whole record. First, the opinion itself was internally
inconsistent. Dr. Voss set out a conservative treatment plan for Palmer: physical therapy,
continued visits with Dr. Voss, and over-the-counter medication as needed for pain. Dr. Voss
nonetheless opined that extreme lifting and sitting limitations were required, *i.e.*, lifting no more
than 10 pound and sitting no more than one hour. A treating physician's inconsistent opinion

may be discounted or even disregarded.  *See Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005). *See also Pepper ex rel. Gardner v. Barnhart,* 342 F.3d 853, 855 (8th Cir. 2003) ("Impairments that are controllable with treatment do not support a finding of total disability.").

The opinion is also inconsistent with Dr. Voss' records of Palmer's treatment. Dr. Voss frequently noted normal findings on physical exam, and that Palmer's condition was stable and controlled, or even improved with treatment.  X-rays and MRIs that the doctor ordered did not reflect severe pathologies.  The therapies that Dr. Voss prescribed over the years were conservative—physical therapy, a TENS unit, and pain medication.  In 2008, while Palmer was still with the Postal Service, the doctor offered to write her an unspecified lifting restriction for work, but Palmer declined it, and nowhere else in the treatment record are any other activity restrictions mentioned, let alone a lifting limit of 10 pounds or a limit of one hour sitting.  *See Toland v. Colvin,* 761 F.3d 931, 935-36 (8th Cir. 2014) (ALJ properly discredited treating physician's opinion because the limitations imposed in the medical source statement were inconsistent with the physician's own treatment notes).

Dr. Voss' opinion is also inconsistent with the specialists' treatment records.  Dr. Voss is a primary care physician, not an orthopedic or pain specialist.  Palmer saw Dr. MacMillan, an orthopedic surgeon, in May 2011, and Dr. Aks, a pain specialist, in June 2014. Both doctors examined Palmer and offered suggestions for treatment, which Palmer declined, but neither doctor opined that Palmer needed limitations on physical activities such as those Dr. Voss identified, let alone any limitations.  *See Brown v. Astrue,* 611 F.3d 941, 953 (8th Cir. 2010) ("Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist.")

Further undermining Dr. Voss' opinion is that it is inconsistent with Palmer's daily

20

activities: driving; going shopping; doing yoga; going to the gym two or three times per week; attending plays, the symphony, and the ballet every three months; watching her grandchildren; taking care of her brother; taking craft classes; doing yard work; visiting with family and friends; going to church; participating in weekly Bible study; cooking large meals with her husband when company came over; and doing light housework. In January 2014, at an appointment for a physical, Palmer admitted to Dr. Voss that she could perform daily activities without difficulty. She also walked in a 5K race in May 2008 and went on a cruise in February 2015. *See Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008) (rejecting limitations found by treating physician where the claimant's "activities of daily living do not reflect" them).

Dr. Voss' opinion that Palmer could lift no more than 10 pounds is also undermined by Palmer's admission in her 2013 adult function report that she could lift 25 pounds, and her admission at hearing that she was under instructions to limit lifting to 20 pounds. *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (rejecting physician's conclusory opinions about the claimant's limitations where the opinions were contradicted by the claimant's own testimony at the administrative hearing).

The ALJ's decision to give Dr. Voss' February 2009 opinion little weight is supported by substantial evidence on the whole record.

### 2. The September 2015 opinion

Palmer obtained a second medical source statement from Dr. Voss, dated September 8, 2015, but did not submit it to the ALJ for consideration. The ALJ issued the decision on September 22, 2015 and Palmer submitted Dr. Voss' second medical source statement to the Appeals Council on October 29, 2015 in connection with her request for review. The Appeals Council denied review. Tr. 1.

21

Palmer argues that the Appeals Council was required to "identify how" the opinion was "weighed[,]" and having failed to do so, remand is required. Doc. 19, p. 3. The argument lacks merit. In denying review, the Appeals Council listed Dr. Voss' September 8, 2015 medical source statement as evidence it considered. Tr. 2 and 4. The Appeals Council also set out the rules it applied in denying Palmer's request for review, and stated that it "found no reason under [those] rules to review the [ALJ's] decision." Tr. 1. That was sufficient. Contrary to Palmer's argument, the Appeals Council was not required to make its own findings or specifically articulate its own assessment of the new evidence. *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir. 1992) (rejecting the claimant's assertion "that when the Appeals Council denies review, it must make its own findings and articulate its own assessment of the new evidence"). *See also Bowen v. Colvin,* 2015 WL 249456, at *5 (E.D. Mo. Jan. 19, 2015) ("[T]here is no requirement that the Appeals Council articulate its reasons for denying review.") (citing 20 C.F.R. § 404.970(b)).

Palmer also argues that the September 2015 medical source statement is consistent with evidence showing she is disabled. The second medical source statement is part of the administrative record on appeal because the Appeals Council considered it in denying review of the ALJ's decision, and this Court must therefore consider it in resolving Palmer's appeal. *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007). Having done so, the Court concludes that Palmer's argument lacks merit. Dr. Voss opined that Palmer was limited to lifting and carrying 10 pounds; limited to sitting, standing and walking for four out of eight hours; needed to lie down for one out of eighth hours; and had manipulative limitations. The doctor opined that Palmer should have moderate limitation against unprotected heights, mild protection against driving automotive equipment, and no limitations against being around moving machinery or

exposure to temperature and humidity extremes and dust. She opined that Palmer's pain was debilitating, her fatigue was frequently debilitating, and she had poor coordination, numbness, and decreased sensation in her extremities, and would miss work more than three times per month. Dr. Voss pointed to Palmer's 2008 MRI showing degenerative disc disease in L3-4 and L4-5, facet degeneration, and right foraminal stenosis, as objective findings supporting her opinion. Finally, the doctor opined that Palmer had been functioning at the described level since August 2008 and that her condition met listing 1.04, disorders of the spine.

As discussed in the preceding section, Dr. Voss' February 2009 medical source statement reflected an extreme opinion that is inconsistent with and unsupported by substantial evidence on the whole record, and does not provide grounds for reversal of the Commissioner's decision to deny benefits. The new statement is even more extreme than the prior one. While the new statement provides more detail than the prior one and specifically cites one test, the November 2008 MRI, the Court concludes the new statement is not supported by substantial evidence on the whole record, for the same reasons as the prior one, and will not restate those reasons here. Dr. Voss adds, in the new statement, that Palmer would miss three or more days of work per month. Such opinion is not supported by substantial evidence on the whole record. For example, Palmer saw Dr. Voss, her primary care provider, a few times per year, *i.e.*, less than would be expected if her condition would cause her to miss work at least three days every month.

In view of the foregoing, the September 2015 medical source statement does not constitute substantial evidence on the whole record supporting the conclusion that Palmer is disabled, and does not merit reversal.

### C. Formulation of the RFC

Palmer argues that the RFC is unsupported by substantial evidence on the whole record.

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Substantial evidence on the whole record, including medical evidence, supports the ALJ's determination of Palmer's RFC. The limitation of lifting 10 pounds frequently and up to 20 pounds occasionally accommodates Palmer's carpal tunnel syndrome, and is consistent with her admission that she can lift up to 25 pounds or has been limited to lifting 20 pounds. The limitation of no hard, repetitive grasping also accommodates her carpal tunnel syndrome. Her degenerative disc disease is accommodated by the limitation of sitting, and standing and walking, up to six hours out of eight; no climbing ladders, ropes or scaffolding; occasional climbing of ramps and stairs; occasional stooping, reaching, and crouching; no crawling; and no unprotected heights. The medical evidence includes the opinions of a consulting examiner, Dr. Palizzi, which was given partial weight, and of two state agency consultants,

Drs. Trowbridge and Foster, whose opinions were given significant weight. The medical records also reflect that from November 28, 2008 through the date last insured, December 31, 2014, no treatment provider imposed functional restrictions. *Hensley v. Barnhart,* 352 F.3d 353, 357 (8th Cir. 2003) (a lack of significant functional restrictions imposed by treatment providers is inconsistent with allegations of disabling limitations).

Palmer argues that the RFC determination is not properly supported because the ALJ gave only little weight to the opinion of her treating physician. As noted, the ALJ gave partial weight to Dr. Palizzi's opinion, and significant weight to the opinions of Drs. Trowbridge and Foster. The opinion of a consulting examiner may be considered "in determining the nature and severity of a claimant's impairment." *Charles v. Barnhart,* 375 F.3d 777, 783 (8th Cir. 2004) (*citing Harris v. Barnhart,* 356 F.3d 926, 931 (8th Cir. 2004), and 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)). The opinion of a non-examining, state agency consultant is also considered and may be given greater weight than the opinions of treating or examining sources. 20 C.F.R. § 404.1527(c); SSR 96-6p, 1996 WL 374180, at *1 and 3 (July 2, 1996). An ALJ may even determine a claimant's RFC without a specific medical opinion, if there is sufficient medical evidence in the record. *Stallings v. Colvin,* 2015 WL 1781407 (W.D. Mo. 2015). Notwithstanding the ALJ's rejection of Dr. Voss' opinion, the RFC is supported by substantial evidence on the whole record, including at least some medical evidence. *See Dykes*, 223 F.3d at 867.

It was Palmer's burden to show she had a more restrictive RFC than the ALJ found and she did not meet it. Accordingly, the RFC determination will not be disturbed.

### D. Findings regarding Palmer's ability to do past relevant work

Finally, Palmer argues reversal is necessary because the ALJ found she could perform

past relevant work as a post-master and mail clerk but failed to make the necessary explicit findings regarding the demands of those prior jobs. Doc. 11, pp. 13-14.

Waddell, the vocational expert, was present at the hearing before the ALJ. The ALJ presented Waddell with a hypothetical question, stating Palmer's limitations consistent with the ALJ's detailed findings concerning Palmer's condition and functional limitations. In testifying that Palmer could perform past relevant work as a postmaster and mail clerk, Waddell explained that her opinion was consistent with the DOT and was supplemented with her work experience in regard to hard repetitive grasping. She did not expressly state the Dictionary of Occupational Title numbers for the jobs, but did state the exertional level, skill level, and SVP level for the jobs.

In the decision, the ALJ made explicit findings about Palmer's RFC and the demands of Palmer's past work. The ALJ also discussed Waddell's opinion, noting that it was consistent with the DOT as supplemented by her work experience, and found that Waddell's testimony was credible. Tr. 27. The ALJ concluded Palmer was capable of performing the jobs of postmaster and mail clerk as those jobs are generally performed. The ALJ's findings are sufficiently specific. *See Pfizer v. Apfel,* 169 F.3d 566, 569 (8th Cir. 1999) (rejecting ALJ's conclusion that claimant could perform past work where ALJ did not address the demands of the past work and made no reference to the DOT; speculative nature of the ALJ's decision reflected more than deficiency in opinion writing and remand was required). *See also Young v. Astrue,* 702 F.3d 489, 491 (8th Cir. 213) ("The ALJ may discharge [his] duty [to make specific findings regarding the demands of past relevant work] by referring to specific job descriptions in the [DOT] that are associated with the claimant's past work.").

Palmer further argues in her reply brief that the ALJ was required not only to reference the DOT, but to state "the specific job number." Doc. 19, pp. 1-2. Even assuming the ALJ was required to have done so, Palmer cites no authority establishing that reversal is required for such

26

a technical error, nor even that the job descriptions the ALJ used were inconsistent with the DOT. Palmer challenges no more than a non-prejudicial deficiency in opinion-writing technique, which does not support reversal. *Pfizer,* 169 F.3d at 569 (citing *McGinnis v. Chater,* 74 F.3d 873, 875 (8th Cir. 1996) (an error in opinion-writing does not support reversal if the error has no effect on the outcome)).

## III.    Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  January 3, 2017
Jefferson City, Missouri